```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

          - v. -                :    S1 09 Cr. 259 (DLC)

CARLOS MEJIA,                   :
JOEL RODRIGUEZ, and
JONATHAN MEJIA,                 :
  a/k/a "Moises,"
                                :
          Defendants.
                                :
- - - - - - - - - - - - - - - x
```

**GOVERNMENT'S TRIAL MEMORANDUM**


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Amie N. Ely
Howard S. Master
Assistant United States Attorneys
     -Of Counsel-

## PRELIMINARY STATEMENT

The United States of America respectfully submits this trial memorandum seeking rulings concerning the admissibility of the following evidence at trial:

1) Evidence concerning the defendant's MySpace pages, in particular: (a) statements by the defendants that help establish facts relevant to the issues in dispute at trial; and (b) boasts and lyrics by defendant Carlos Mejia demonstrating Mejia's knowledge of narcotics trafficking activities and consciousness of guilt;

2) Statements made by defendant Joel Rodriguez during a prison call concerning his willingness to accept a guilty plea to the charged narcotics conspiracy; and

3) Evidence of unexplained wealth in the defendants' possession as proof of the charged crimes.

## BACKGROUND

### A.   The Charged Offenses

The following discussion assumes familiarity with the factual background provided in the Government's motion _in limine_ dated January 8, 2010.  As set forth in that motion, trial defendants Joel Rodriguez ("Rodriguez") and Carlos Mejia ("Mejia") are charged in a two-count Superseding Indictment (the "Indictment") in connection with their participation in efforts to obtain a car from a confidential informant (the "CI") in the Bronx that they believed contained almost 30 kilograms of cocaine

in a concealed compartment.  Rodriguez was arrested while driving a Pontiac car which he had used to engage in countersurveillance activities (the "Pontiac").

### B.   The Prior Narcotics Arrest

Also as set forth in that motion, several months prior to their January 2009 arrest, in June 2008, Rodriguez and Mejia were arrested by the New York City Police Department ("NYPD") as Rodriguez was sitting in the driver's seat, and Mejia was leaning into, a van (the "Van") that contained over $15,000 in cash, along with over 50 bags of marijuana and one bag of cocaine, in a concealed compartment.  Prior to the arrest, Mejia was observed approaching the van at least twice, leaning in or near the back passenger door, which appeared to be open.

The Government has gathered additional evidence since the filing of the motion in limine demonstrating that the June 2008 arrest is connected to the charged conduct in more ways than previously described to the Court.  The Government expects that the evidence at trial will show that the Van, which was registered to Rodriguez, was seized by the NYPD following the June 2008 arrest described above because the Van was being used to facilitate drug-trafficking activities.  Following that arrest, Rodriguez induced a friend (the "Friend") to register the Pontiac in the Friend's name by stating to the Friend that Rodriguez was experiencing problems with his drivers' license; he did not reveal to the Friend that the Van had been seized for

drug trafficking activity.  In January 2009, the Pontiac was seized by the DEA because it also was being used for drug trafficking activity.  In the Pontiac were papers related to the seizure of the Van, and to Rodriguez's and Mejia's arrest in June 2008.  Following the seizure of the Van, Rodriguez, among others, tried to induce the Friend to lie to the DEA about the Friend's ownership and use of the Pontiac.  These false statements to the Friend, and efforts to induce the Friend to lie to the DEA, provide powerful evidence of Rodriguez's consciousness of guilt and demonstrate further the ways in which the June 2008 and January 2009 arrests are intertwined.[1]

## C.   The Defendants' MySpace Pages

The Government expects that, if permitted to introduce this evidence, the evidence at trial would establish that each of the

---

[1] Defendants' January 15, 2010 letter replying to the Government's motion in limine (the "January 15 Reply") misstates the facts surrounding the June 2008 arrest that the Government anticipates will be proven at trial, and that render the arrest sufficiently similar to the January 2009 arrest to be admissible at trial under Fed. R. Evid. 404(b), in the event that the incident is not admitted as direct evidence of the charged offenses.   To the extent the defendants argue that differences between the quantities and types of narcotics involved in the June 2008 and January 2009 arrests are relevant to the Court's consideration, the Second Circuit has without hesitation permitted the admission of prior acts under Rule 404(b) involving different narcotics than those that are charged; here, in any event, the June 2008 arrest involved cocaine as well as marijuana.  See, e.g., United States v. Zackson, 12 F.3d 1178, 1182-83 (2d Cir. 1993) (evidence of defendant's participation in prior marijuana conspiracy deemed admissible at cocaine conspiracy trial as proof of defendant's knowledge and intent to participate in cocaine conspiracy).

defendants maintained accounts on the MySpace social networking site.[2] Parts of the defendants' MySpace accounts are viewable by the public via the Internet, but other portions, including email messages sent to and from the defendants using their MySpace identities, are not publicly available but were obtained by the Government pursuant to a search warrant directed to MySpace for the full content of the defendants' MySpace accounts, the results of which were received earlier this month.[3]

The MySpace accounts contain statements and other evidence of two types that is relevant to the issues to be decided at trial: (a) evidence relevant to proving the

---

[2]      MySpace is "a website that allows its users to create an online community where they can meet people.  MySpace can be used to share photographs, journals, and 'interests' with mutual friends. People with MySpace accounts can create a 'profile,' to which they can link their friends, and the owner of the profile can either invite people to become friends, or other MySpace users can ask the owner of the profile to become friends with the owner of the profile.  If the owner of a profile accepts another MySpace user as a friend, the friend's profile picture is posted on the profile owner's MySpace page, along with a link to the friend's MySpace profile.  The owner of a profile can kick friends off his profile, deleting that friend's profile picture from the owner's profile page.  In addition, a profile owner can completely block other MySpace users from viewing his profile page.  The owner of a profile can post blogs on his own profile page, allow other MySpace users to post comments on his profile page, or post comments on other users' profile pages." Spanierman v. Hughes, 576 F. Supp. 2d 292, 297-98 (D. Conn. 2008).

[3] The Government immediately produced the materials provided by MySpace upon their receipt in January 2009.  Because the materials were primarily in Spanish and were of significant volume, the Government did not have the opportunity to obtain translations of relevant MySpace communications, or to evaluate their significance, until well after the Government's initial motion in limine was filed.

defendants' identities and connecting them to phones that were used to facilitate the charged crimes, and evidence of unexplained wealth in the defendants' possession; and (b) evidence demonstrating defendant Mejia's knowledge of narcotics trafficking and consciousness of guilt, in particular Mejia's creation and publication of narcotics-related boasts and lyrics on his MySpace page, some contemporaneous with or prior to his commission of the charged offenses.

Proof of Relevant Facts.  With respect to the first category of evidence, the defendants' MySpace pages contains information tying the defendants to each other and to other evidence found in the case, and in the case of defendant Mejia, tends to show his consciousness of guilt.

*Identification Information*: The MySpace pages connect the defendants to each other by establishing that they go by the nicknames "Panita" (Rodriguez) and "Dirty Harry," "Dirty Dirty," or "Dirty" (Mejia), and by demonstrating their use of certain phone numbers that facilitated the commission of the charged crime.  For example, the title of Rodriguez's MySpace page, which contains multiple photographs of Rodriguez and is in the name of "Joel," is "El Panita Power."[4]  Mejia's MySpace page is in the name of "DiRty HaRrY," and it contains multiple

---

[4]  See "Joel - 33 - Male - Bronx, New York," available at http://www.myspace.com/333998914 (last visited January 26, 2010).

photographs of Mejia with other individuals and with vehicles.[5]
December 6, 2008, Mejia sent an email from his MySpace account
stating "HELLO BEAUTIFUL MY NAME IS DIRTY DIRTY AND WHAT IS
YOURS."[6]  Other MySpace emails reference the defendants'
identities and phone numbers that they are using.

The nicknames by which the defendants are known provides
important corroboration for the connections and relationships
between the two defendants, and for their use of telephones that
were used to communicate with the CI and other co-conspirators in
the case.  For example, in one of several telephones that was
seized from Mejia incident to arrest ("Mejia Phone-1"), the name
"Panite" appears in the contact list, along with a Nextel point-
to-point number; that point-to-point number is associated with a
phone that was found in the Pontiac that Rodriguez was driving
when he was arrested (the "Pontiac Phone").  The Pontiac Phone,
in turn, lists under "Har" a Nextel point-to-point number that is
associated with the Mejia Phone-1.  Both of these phones are in
contact with other co-conspirators in the case.  In another
cellphone seized from Mejia incident to his arrest, the phone
lists "Dirty Dirty" as the name of the user of the phone.  There

---

[5] See "DiRtY HaRrY - 39 - Male - DA BX,New York," available
at http://www.myspace.com/219598280 (last visited January 26,
2010).

[6] Following are draft translations of the original Spanish-
language MySpace messages.  These translations are subject to
change before they are finalized by the Court-certified
interpreter.

are numerous other connections between the phones seized incident to the defendants' arrests that may be fully understood only if the nicknames of the defendants are known; thus, the nicknames used by the defendants on their MySpace pages are highly relevant to the issues in dispute at trial.

*Ownership of Automobiles as Evidence of Unexplained Wealth:* Mejia's MySpace page contains photos of him standing next to a white E55 Mercedes Benz that evidence at trial will show was purchased in his mother's name in or about 2007 for $35,000 in cash, as well as a Honda vehicle valued at several thousand dollars that was used for drag racing and that evidence will show was owned by Mejia. In addition, Mejia frequently references these vehicles in his MySpace communications. For example, in a MySpace email dated December 24, 2007, Mejia wrote "Omarly check out my E55 700 horsepower in the tire," i.e., "check out my 700 horsepower E55." In a MySpace email dated May 8, 2009, Mejia wrote "THAT BENZ IN MY FRONT PAGE GOES DOWN 10; 8 TO THE 4TH MILE 140 MILES TO THE 4TH MILE. IT'S THE FASTEST IN NY MILES TOO." On June 11, 2009, Mejia wrote another MySpace email in which he states, "IT'S NOT THE NUMBER OF BULLETS IN MY GUN BUT HOW DO I GET OUT OF THE HOLE. . . . NOT EVEN GRASS GROWS IN MY WHITE BENZ." In a MySpace email dated April 30, 2009, Mejia writes, "Check out my powerful Honda 1300 horsepower 9 seconds." Other emails, both before and after Mejia's arrest, reference Mejia's ownership of a Mercedes Benz.

Each of these boasts concerning Mejia's ownership of expensive vehicles indicates, along with other evidence that the Government intends to present in the case, that Mejia obtained wealth that is inconsistent with his alleged employment as a porter at a tax preparation business and/or as a mechanic, and that, as described below, provides powerful evidence of his participation in lucrative narcotics trafficking activities.

<u>Proof of Knowledge and Consciousness of Guilt.</u>
Mejia's MySpace page also contains a number of narcotics-related boasts and lyrics, some prior to or contemporaneous with the charged offenses, that are admissible to demonstrate his knowledge of the narcotics trade, and his consciousness of guilt, for the reasons set forth below.[7]

_____

[7] Mejia's MySpace page also contains sexually-explicit and violent boasts and lyrics that are not explicitly connected to Mejia's participation in the narcotics trade.  For example, in a MySpace email dated February 26, 2008, Mejia wrote and in a MySpace email dated November 10, 2008, Mejia wrote "I'm Dirty Dirty rapping like fire cutting up more live people than ham at a deli, you didn't read [or "didn't you read"] the sign Dirty Dirty around the corner had a search, 25 rappers thrown on the floor, the mandate was a simple one, they all had to turn their pocket inside out."  The Government does not at present seek to introduce evidence of Mejia's violent lyrics and boasts in its case-in-chief.  However, the Government may seek to introduce these and similar lyrics to cross-examine Mejia in the event he were to testify at trial.  The Government may also seek to confront Mejia with other apparently coded conversations concerning narcotics trafficking activities.  For example, Mejia received an email on October 14, 2009, after his arrest in the instant case, in which the sender of the email stated "Man I'm sounding good [or well known] now in Santo Domingo but I need support if you find a connection that wants to wash/launder a couple of clothes I'm here."  This apparent reference to money laundering activities ("wash/launder a couple of clothes"), as well as other coded messages apparently reference narcotics

Following is a non-exhaustive list of boasts and lyrics that explicitly reference Mejia's participation in narcotics-related activity:

- Mejia wrote a MySpace message on February 26, 2008, stating, "Like my DC [desert?] 44 automatic [i.e., gun] but no reverse known in the neighborhood as a one buck bill. . . . So that one that has talked a lot about me, I gave him what he deserved, death to the rat and street police, philosophy, animal instinct. You can run or confront me but the result is gonna be the same for talking so much.  Outstanding, first place I live in the BX [Bronx] I hang out in the heights. Chlorophyl [i.e., marijuana], expensive cars and a lotta bucks. I look meek but I break whoever. A lotta [people] call [or "insult"] me  because they're short on words. Yeah, Dirty Dirty  is not rabies he fucks without condoms cause AIDS isn't contagious."

- On July 30, 2008, Mejia wrote a MySpace email in which he stated, "Don't go by my nickname that's what they call me because of the way I get my things/stuff but you outshine your two girlfriends in that photo, you're [tops] if you're not the most beautiful in the little world/globe you're the prettiest on the planet."

- On September 30, 2008, Mejia wrote a MySpace email stating, "It's me, I arrived open the way, I'm gonna show you that I'm the one that controls the neighborhood this, that, that don't go out on the street because you don't pay for stamp[s] [i.e., drugs]. Confronting me is a mistake. One's gotta be afraid of me, panicky, terror[ized] [of me]."

- On October 14, 2008, Mejia wrote a MySpace email stating, "My boy Skeem, it's me, open the way, I'm gonna show you that I'm the one that controls the neighborhood. This, that, that, don't go out in the street because you don't pay [for] stamp[s] [i.e., drugs]. Confronting me that's a mistake. I vocalize all I talk, whoever confronts me gets taken by the devil that's cause I'm Dominican a polished nigger, I smoke and rob because I'm enchanted by problems don't you see that your style is out now. If Skeem doesn't kill I kill you."

- On January 22, 2009, Mejia and Rodriguez were arrested on

---

trafficking activities, would be a proper subject of cross-examination at trial were the defendants to deny knowledge of narcotics-related activity in their testimony at trial.

- 10 -

the instant charges.  Mejia was released on bail on January 29, 2009.  On February 12, 2009, in the third email that Mejia sent from his MySpace account after his release, Mejia wrote a MySpace email stating, "I'M AN ALPONE NARCO AND I HAVE CONTROL OF THE AREA OF THE SOUTH. A KARAT [OR PLAY UPON WORDS: "KILATES"/KARATS SLANG MEANING "KILOS"] BUT A SINGER: YOU'RE ONLY [A] MULE I FOUND OUT. I'LL HAVE THEM TAKE CARE OF YOU. HERE, I'M THE ONE THAT SUPPLIES. DON'T MAKE ME STAND AT CLOSE RANGE AND SHOOT YOU WITH MY PLASTIC GUN AND MY ELASTIC TONGUE. I SET THE ARTISTIC CLASS DIRTY CONTROLS PASSING PARAFFIN TESTS. DEATH TO WHOEVER TALKS AND IF I'M [FOUND] GUILTY OF MY ACTS FOR WHICH I WAS ASKED TO APPEAR BY [OR "FOR"] THE GRASS, REGARDLESS OF WHAT HAPPENS GIVE ME THE GAS CHAMBER."[8]

• The next day, February 13, 2009, Mejia wrote a MySpace email in which he stated, "Here's the Dominican living in New York with a couple of [coke spots] and with control of the situation without mentioning how well known I am without bullshit and with a good reputation."

• On September 14, 2009, Mejia wrote a MySpace email stating, "Rather than Dengue fever killing me I prefer to die of AIDS. Snow White lives on her stove [?] I live on my bullshit the damn police."

• On October 19, 2009, Mejia wrote a MySpace email stating, "PASS ME THE SCALE CAUSE I'M MORE BLOODY AND NOCTURNAL THAN COUNT DRACULA PASS ME THE SCALE CAUSE I HAVE 500 OF ONE THOUSAND AND WE GOTTA CHECK BEFORE DISTRIBUTING."

———————————

[8] It appears that these lyrics are similar to lyrics by the popular musician Tempo in the song "Narcochampon," with one critical exception.  See http://www.youtube.com/watch?v=q2eBLEumGS4 (last visited January 26, 2010) (recording of "Narcochampon"); http://www.justsomelyrics.com/70448/Tempo-Narcohampon-Lyrics (last visited January 26, 2010) (Spanish-language lyrics for "Narcochampon").  While Tempo wrote (and sang) "I set the artistic class, Tempo controls passing parrafin tests [i.e., gun tests]" (emphasis added), Mejia, a/k/a "Dirty," wrote "I SET THE ARTISTIC CLASS DIRTY CONTROLS PASSING PARAFFIN TESTS," (emphasis added), thus indicating Mejia's intent to adopt and modify the lyrics as his own.

_____**D.   The Plea Prison Call**

_____ Joel Rodriguez expressed his intention to plead guilty to a narcotics trafficking offense in the instant case during a call that was recorded by prison officials while the Rodriguez was incarcerated pending his release on bail.  The following is an excerpt from the call, which was made by Rodriguez to his sister Francia on March 1, 2009 (the "Plea Prison Call"):[9]

| Joel Rodriguez: | Nothing. So, the lawyer, have you spoken to him? | Nada. ¿Y el abogado, no ha' habla'o con él? |
|---|---|---|
| Francia: | Yeah, we talked to him. | Sí, nosotros hablamos con él. |
| Joel Rodriguez: | Oh. | Oh. |
| Francia: | Uh-huh. | Ujú. |
| Joel Rodriguez: | No, so you could ask Tito to call him. | Na', pa' que tú le dijera' a Tito que lo llamara a él. |
| Francia: | The lawyer? | ¿Al abogado? |

_____

[9]  Bracketed and italicized text represents text that the Government would consent to redacting in order to prevent the jury from gaining knowledge of, and being improperly influenced by, the potential sentences faced by the defendants.  Bracketed and bolded text adjacent to the bracketed and italicized text represents proposed generic replacements for the text that would be redacted.

Joel Rodriguez:    Aha.                                Ajá.

Francia:           Aha.                                Ajá.

Joel Rodriguez:    And he should tell him that,        Y que le diga que, que...
                   that... if... to call the           si... que llame al fiscal,
                   prosecutor to see if I can cop       a ver si yo puedo capiar,
                   out without, without... before      sí, ahora sin, sin...
                   the indictment.                      ante' del indictment.

Francia:           To call the law-... ah...            Que llame al abo-... ah...
                   well, Tito is gonna go               bueno, Tito va mañana, tú
                   tomorrow, you tell him.              le dices.

Joel Rodriguez:    You're not coming?                   ¿Tú no viene'?

Francia:           Yeah.                                Sí.

Joel Rodriguez:    Oh!                                  ¡Oh!

Francia:           I'm going. But I'm saying that       Yo voy.  Pero que yo digo
                   I forget things like that.           que cosas así, a mí se me
                                                        olvidan.

Joel Rodriguez:    Ah?                                  ¿Eh?

| | | |
|---|---|---|
| Francia: | That I forget things like that. | Que cosas así, a mí se me olvidan. |
| Joel Rodriguez: | Because it'd be better, 'cause the sooner we talk to him, the better. | Porque era mejor que mientras uno habla con él, más rápido, e' mejor. |
| Francia: | They told you [that]? | ¿Te dijeron? |
| Joel Rodriguez: | Yeah, another... a guy from here was telling me... | Sí, me estaba diciendo otro... un muchacho de aquí... |
| Francia: | Aha. | Ajá. |
| Joel Rodriguez: | ... because if they do the indictment, it's worse. | ... porque si hacen el indictment, es peor. |
| Francia: | What is that, "indictment"? | ¿Qué es eso, "indictment"? |
| Joel Rodriguez: | That's all the accusations they have. | Eso e' to las acusaciones que tienen ello'. |
| Francia: | Oh. | Oh. |

| Joel Rodriguez: | Let's suppose, since they have a complaint against me, if I cop out... that... let's suppose, if I plead guilty to that complaint... | Vamos a suponer, como ellos tienen un complein en contra mio, que si yo capeo hay... que... vamos a suponer, si yo me hago culpable en ese complein... |
| --- | --- | --- |
| Francia: | Uh-huh. | Ujú. |
| Joel Rodriguez: | ...that's [*five-to-40*] **[A SHORTER SENTENCE]**... | ...que es de cinco pa' cuarenta... |
| Francia: | Uh-huh. | Ujú. |
| Joel Rodriguez: | ...so, it turns out to be [*just five years, a little over three years*]. **[LESS TIME]** | ...entonces, cuando viene a ver, nada má' son cinco año', tre' año' y pico. |
| Francia: | Oh. | Oh. |
| Joel Rodriguez: | Because one can receive... they hand down the indictment, and it could be more time, and it's worse. | Porque puede recibir... ponen el indictment, y puede ser más tiempo, y es peor. |
| Francia: | Oh! | ¡Oh! |

- 15 -

| Joel Rodriguez: | You understand? | ¿Tú entiendes? |
|---|---|---|
| Francia: | Aha. So we... so we talk to.... | Ajá. Porque le... porque le hablemos a.... |
| Joel Rodriguez: | ... to call the lawyer and tell him to, to call the prosecutor... | Que llamen al abogado y que le diga que, que llame al fiscal... |
| Francia: | Uh-huh. | Ujú. |
| Joel Rodriguez: | ... [to say] that I wanna plead guilty to the complaint, that I accept [*the five-to-40*] **[A SHORTER SENTENCE]**. | ... que yo me quiero hacer culpable del complen, que yo acepto lo' cinco pa' cuarenta. |

### E.   Evidence of Unexplained Wealth

<u>Rodriguez</u>.  The Government intends to introduce evidence that establishes that Joel Rodriguez lied when he claimed to be employed by Gonzales Electronics while giving his pedigree information soon after his arrest.  The Government expects that both testimonial and documentary evidence, including Rodriguez's resume and documents found in the Pontiac he was driving when arrested will show that Rodriguez had been unemployed for some time when he was arrested.

The Government intends to introduce evidence that shows

that, as explained above, despite being unemployed, Rodriguez nonetheless purchased the Pontiac after the Van was seized by the NYPD for involvement in narcotics-trafficking activities.  To this end, the Government expects to introduce, inter alia, a telephone conversation Rodriguez made while he was in prison in which he referred to the Pontiac, which was seized after he was arrested on the instant charges on January 22, 2009. Specifically, Rodriguez stated that "a paper arrived," regarding the car, to which his paramour responded, "it's better, because that way, that car isn't gonna be lost there."  The Government believes that this and other testimony will establish that, while the Pontiac was registered to the Friend, Rodriguez was the true owner of the Pontiac.

Additionally, the Government intends to introduce evidence found in Rodriguez's possession or in the Pontiac, including a number of documents such as Rodriguez's resume, that help establish that the Pontiac belonged to him.

Mejia.  When arrested, Mejia stated that he worked as a "porter/mechanic" at an unnamed business.  As set forth above, the Government intends to demonstrate that Mejia was the true owner and user of a 2005 Mercedes E55, which was purchased in his mother's name in approximately 2006 for $35,000 cash, and of a Honda drag racing car, through statements on his MySpace page regarding his ownership of the vehicles; and other evidence proving his ownership and use of the vehicles.  Additionally, the

Government intends to introduce two deposit slips, each
reflecting a date of September 16, 2008, and each reflecting a
deposit of $9,000, that were found in Mejia's possession at the
time of his arrest.

          Rodriguez and Mejia.  Moreover, the Government intends
to show, subject to the Court's ruling on its motion in limine,
that Rodriguez, Mejia and others possessed over $15,000 in cash,
in close proximity to narcotics, incident to arrest in June 2008,
demonstrating that Rodriguez and Mejia derived otherwise-
unexplained income from narcotics-trafficking activities.

## ARGUMENT

**A.      The Proffered Evidence from the Defendants' MySpace
         Pages Is Admissible**

### 1.   Legal Principles

          Statements made by a criminal defendant are non-hearsay
if the statements are offered against the defendant.  See Fed. R.
Evid. 801(d)(2)(A).  Specifically, Rule 801(d)(2)(A) provides
that "[a] statement is not hearsay if . . . [t]he statement is
offered against a party and is . . . the party's own statement."
Id.  Because such "party admissions" are non-hearsay, they may be
admitted for their truth.  See United States v. Russo, 302 F.3d
37, 43 (2d Cir. 2002) ("Statements made by the defendant may be
introduced by the government in a criminal trial to prove the
truth of the facts stated in them because they are admissions of
an adverse party.") (citing Fed. R. Evid. 801(d)(2)(A))).  Such

"[a]dmissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule." Fed. R. Evid. 801(d)(2)(A), Advisory Committee Notes (1972). The defendants' statements and photos on their MySpace pages will thus be admissible against them if they are relevant and their probative value is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." (emphasis added). Fed. R. Evid. 403.[10] Evidence will not be excluded as unduly prejudicial when it is not "more inflammatory than the charged crime." United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999)(citing United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990)).

Fed. R. Evid. 401 defines relevant evidence as having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Thus, the defendants' own statements on their MySpace pages are presumptively admissible at trial, and any challenges to the interpretation of the statements goes to weight, not admissibility. See, e.g., Huddleston v. United States, 485 U.S.

---

[10] The Government will obtain, by stipulation or through the testimony of a records custodian with MySpace, proof that the contents of the defendants' MySpace pages obtained by search warrant are admissible business records of MySpace.

681, 687 (1988) (relevant evidence "is admissible unless the Rules provide otherwise"); United States. v. Diaz, 878 F.2d 608, 615 (2d Cir. 1989) (affirming admission of relevant evidence that was "subject to attack" on grounds that "[o]nce relevance is established . . . such challenges go to weight rather than admissibility").

Even where not admitted for all purposes, the defendants' statements on their MySpace pages, in particular Mejia's boasts and lyrics concerning his participation in narcotics trafficking activities, are probative of Mejia's knowledge of narcotics trafficking and his consciousness of guilt.  In United States v. Foster, 939 F.2d 445 (7th Cir. 1991), for example, the Seventh Circuit admitted a defendant's purportedly fictional boasts concerning his participation in narcotics trafficking activities.  In that case, the defendant (Foster) was arrested while in possession of illegal narcotics, concealed in a suitcase.  Lyrics to a rap song written by Foster containing drug-related language and boasts were also found in the defendant's possession incident to arrest.  Id. at 449.  At trial, Foster alleged the he did not know he was carrying illegal narcotics.  The Government admitted the rap lyrics as evidence of the defendant's knowledge and intent, subject to a limiting instruction.[11]  The Seventh Circuit affirmed the admission of the

---

[11] The Government would not object to a limiting instruction in this case should the Court determine that the narcotics-related statements and boasts may admitted at trial only as

rap lyrics as probative of the defendant's familiarity with

narcotics trafficking activities:

> [A]dmitting the rap verse was not the equivalent of
> admitting The Godfather as evidence that Mario Puzo was
> a mafia don or admitting "The Pit and the Pendulum" as
> evidence that Edgar Allen Poe had tortured someone. It
> was, instead, the equivalent of admitting The Godfather
> to illustrate Puzo's knowledge of the inner workings of
> an organized crime family and admitting "The Pit and
> the Pendulum" to illustrate Poe's knowledge of medieval
> torture devices. Rap music, under Foster's definition,
> "constitutes a popular musical style that describes
> urban life"; it describes the reality around its
> author. And it is Foster's knowledge of this reality,
> as evidenced by the verse that he has admittedly
> authored, that was relevant to the crimes for which he
> was charged.

Id. at 456.  Foster was in turn cited with approval by the Second

Circuit in United States v. Garcia, 291 F.3d 127 (2d Cir. 2002),

which noted that Foster authorized admission of "Rule 404(b)

evidence of defendant's poems using slang and code for drugs as

relevant to defendant's knowledge of drugs in the instant case

because the poems 'indicated, at a minimum, that [the defendant]

was familiar with drug code words and, to a certain extent,

narcotics trafficking, a familiarity that made it more probable

that he knew that he was carrying illegal drugs,'" Id. at 137

(quoting Foster, 939 F.2d at 455); see also United States v.

Wilson, 493 F. Supp. 2d 460, 462-63 (E.D.N.Y. 2006) (admitting

rap lyrics describing activities resembling charged murder that

referenced personal characteristics of the defendant); cf. Clark

---

evidence of Mejia's guilty knowledge.

v. State, 915 N.E.2d 126, 128 (Ind. 2009) (affirming use on cross-examination of statement on murder defendant's MySpace page as evidence of defendant's consciousness of guilt where defendant stated, "To those people I say, if I can do it and get away. B ... sh.... And with all my obstacles, why the f ... can't you.").

Even where lyrics or boasts were not written by a defendant but were merely used or possessed by a defendant, they may be admissible to prove the defendant's knowledge and intent where these issues are in dispute at trial. See United States v. Magleby, 241 F.3d 1306, 1318-19 (10th Cir. 2001) (admitting evidence of defendant's possession of, and frequent listening to, racist songs as probative of defendant's racial animus in cross-burning case).

### 2. **Analysis**

_____    The defendants' statements and photographs on their MySpace pages may be used to prove the defendants' nicknames, possession of unexplained wealth, and use of phone numbers that facilitated the commission of the charged offenses, among other facts at issue in the case. These facts are directly relevant to the issues in dispute at trial, and proving these facts through the defendants' MySpace pages cannot be substantially more prejudicial than probative. The means of proof for these facts will not be inflammatory; the statements and photos on the pages will be read into the record or shown to the jury. In addition, the proof will not be cumulative or mislead the jury; because

there are no co-conspirator cooperating witnesses in this case, a
primary means by which the Government will be able to prove the
defendants' nicknames and possession of unexplained wealth will
be the defendants' own words and photos on their MySpace pages.
Accordingly, these portions of the defendants' MySpace pages
should be admitted at trial.

Mejia's narcotics-related lyrics and boasts are also
highly probative of his knowledge and consciousness of guilt,
which are expected to be the central issues at trial.  Mejia was
apprehended on January 22, 2009, as he sought to obtain a car
that, but for the intervention of the DEA and the CI, would have
contained 28 kilograms of cocaine.  Thus, the Government expects
that, as with the defendant in Foster, who alleged ignorance of
the contents of a drug-laden suitcase, Mejia will allege that he
did not know what was expected to be contained within the vehicle
that he was receiving from the CI when he was arrested.  Also as
in Foster, Mejia's extensive familiarity with the language and
methods of narcotics-trafficking activity, as evidenced by
postings on his MySpace page that are contemporaneous with or
prior to his January 2009 arrest, demonstrate that Mejia "'was
familiar with drug code words and, to a certain extent, narcotics
trafficking, a familiarity that made it more probable that he
knew that he was [receiving] illegal drugs,'" Garcia, 291 F.3d at
137 (quoting Foster, 939 F.2d at 455).  Accordingly, Mejia's
statements should be admissible as proof of Mejia's knowledge of

narcotics trafficking activities and methods.

In addition, several of the statements, both prior to, contemporaneous with, and following Mejia's arrest, demonstrate Mejia's consciousness of guilt.  for example, Mejia's July 30, 2008, statement, "Don't go by my nickname that's what they call me because of the way I get my things/stuff," demonstrates the defendant's knowledge that he got his "stuff" through means indicated by his nickname: "Dirty," i.e., illegal.  The defendant's references to himself as a "narco," and as one who "supplies" and "controls" in the February 12, 2009 posting referenced above, as well as his statement (borrowing from Tempo) "If I'm [found] guilty of my acts . . . regardless of what happens give me the gas chamber," were written by Mejia shortly after he was released on bail for trafficking in narcotics, and while charges were pending against him.  This posting tends to show that, rather than surprising Mejia, the narcotics arrest and pending charges were cause for boasting and celebration. Similarly, his posting the next day, February 13, 2009, in which he asserted that he was a "Dominican living in New York with a couple of [coke spots] and with control of the situation," shortly after being released on cocaine trafficking charges, demonstrates not only his familiarity with narcotics-trafficking terms, but also his celebration of the illegal conduct that resulted in his arrest, in a forum (MySpace email) that he believed would be private.

Mejia's narcotics-related boasts and lyrics should not be barred under Rule 403.  They are, for the reasons set forth above, highly probative of the defendant's guilty knowledge, the expected central issue at trial.  While the defendant's boasts may result in some prejudice to Mejia, in the sense that all relevant evidence is prejudicial, it is no "more inflammatory than the charged crime," Livoti, 196 F.3d at 326.  To the extent that the Court deems it necessary to admit some or all of the narcotics-related boasts for the limited purpose of demonstrating guilty knowledge, as in Foster, a limiting instruction would adequately address any potential for undue prejudice that may be presented by admission of this evidence. See United States v. Tussa, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant).

**B.   Rodriguez's Expressed Willingness to Plead Guilty is Admissible as Evidence of Consciousness of Guilt.**

**1.   Legal Principles**

Caselaw has made clear that a defendant's expression of a willingness to plead guilty is evidence of his consciousness of guilt.  For example, in United States v. Sutton, 732 F.2d 1483, 1489 (10th Cir. 1984), a tape-recorded conversation in which the defendant told another person that the defendant's attorney thought the defendant was guilty and advised him to plea bargain was admissible because it tended to prove the defendant's consciousness of guilt.  Id.  Similarly, in a Ninth Circuit case,

a prison counselor was permitted to testify about a conversation
in which the defendant told him that he "would probably 'cop' to
a charge of manslaughter" as evidence of the defendant's
consciousness of guilt.  United States v. Castillo, 615 F.2d 878,
885 (9th Cir. 1980).[12]  The Second Circuit has also signaled, in
an unpublished decision, that a defendant's discussions about
whether he intends to plead guilty are relevant. Cf. United
States v. Triumph, 266 Fed. Appx. 53, 55 (2d Cir. 2008)
(unpublished) (district court did not abuse its discretion in
admitting testimony of defendant's prior lawyer regarding the
defendant's willingness to plead guilty); United States v.
Biaggi, 909 F.2d 662, 691 (2d Cir. 1990) ("The probative force of
a rejected immunity offer is clearly strong enough to render it
relevant.").  Accord 2 Wigmore on Evidence § 293, at 232 (J.
Chadbourn rev. ed. 1979) ("Let the accused's whole conduct come
in; and whether it tells for consciousness of guilt or for
consciousness of innocence, let us take it for what it is worth,
remembering that in either case it is open to varying
explanations and is not to be emphasized.").

### 2.  **Analysis**

The Plea Prison Call is proof of Rodriguez's
consciousness of guilt.  While Rodriguez does not directly admit

---

[12]    As these statements were not made in the course of plea
negotiations, Federal Rule of Criminal Procedure 11 and Federal
Rules of Evidence 408 and 410 do not bar their admission.  See
Castillo, 615 F.2d at 885.

that he knew that narcotics were in the car he expected to receive from the CI, his statements regarding his willingness to enter a plea, pre-indictment, indicate that he believes that he is guilty of narcotics-trafficking activity.  Rodriguez's admissions in the Plea Prison Call that he wanted to "cop out ... before the indictment,"  are quite similar to the statements the defendant made to his counselor in <u>Castillo</u>, 615 F.2d at 885, and even more direct proof of Rodriguez's consciousness of guilt that the statements admitted in <u>Sutton</u>, 732 F.2d at 1489, where the defendant merely related <u>his lawyer's</u> advice that he should plead guilty.  Moreover, the portion of the Plea Prison Call set forth above is not more unfairly prejudicial than probative.  To address the possibility that the call may be open to differing interpretations, the Government would agree to admit the entire portion selected, rather than just the section where Rodriguez states that he would like to plead guilty.  Additionally, because the term of imprisonment that the defendant faces is not a proper consideration for the jury, the Government proposes the redactions set forth and described above.

**C.   The Defendants' Unexplained Wealth is Admissible to Prove Their Participation in the Charged Conspiracy.**

### 1.   <u>Legal Principles</u>

It is well settled in this Circuit that unexplained wealth is relevant to create an inference of illicit gain.  <u>See</u> <u>United States v. Cruz</u>, 797 F.2d 90, 95 (2d Cir.1986).  In <u>United</u>

States v. Viserto, 596 F.2d 531 (2d Cir. 1979), the Second
Circuit held that the district court did not abuse its discretion
in admitting proof of cash expenditures, where "there was no
affirmative evidence that the cash was derived from legitimate
business, there was sufficient relevance to the crime charged for
the consideration of the jury."  As the Circuit noted, "wealth is
relative"; even relatively "modest" expenditures may be
probative, depending on the facts of the case. United States v.
Anglin, 169 F.3d 154, 161-62 (2d Cir. 1999) (citing United States
v. Trudo, 449 F.2d 649, 651 (2d Cir. 1971) (evidence of
post-robbery "sudden acquisition of wealth" probative to
establish defendant's identity as one of the robbers: "Trudo had
a very meager income in the fall of 1969 and lived very modestly.
In the weeks following the robbery there was an abrupt change in
his spending habits. He purchased a used car for $500 and gave a
$100 gift to a girl friend.")). Cf. United States v. Crisp, 435
F.2d 354, 360 (7th Cir. 1970) ("Although relevant to the
probative value and weight of such evidence, proof of prior
impecunity is not necessary, and admission of [unexplained
wealth] is entrusted primarily to the sound discretion of the
trial court.").

   **2.  Analysis**

   Here, the Government expects that the evidence will
show that Rodriguez lied about being employed by Gonzales
Electronics, and that he used a "straw purchaser" to buy the

Pontiac for him around the time the Van was seized by the NYPD in June 2008.  Mejia, likewise, was the owner of a Mercedes bought with $35,000 cash, formally purchased by his mother, whom the Government would also argue was a "straw purchaser" in view of Mejia's use and claimed ownership of the Mercedes.  The deposit slips found in his possession, which suggest that he deposited $18,000 in one day, also suggest that he had access to cash from prior narcotics dealing.  Additionally, the Government intends to introduce, subject to the Court's ruling on our prior 404(b) motion, evidence that Rodriguez and Mejia were arrested in or near Rodriguez's van in June 2008, and that van contained over $16,000 cash, which was next to 55 small bags of marijuana and a bag of cocaine.  This evidence of unexplained wealth is relevant as it would permit the jury to infer that the defendants were able to purchase their automobiles—automobiles for which they each used someone else to purchase—with narcotics proceeds. Cruz, 797 F.2d at 95; Viserto, 596 F.2d at 531.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should grant the relief requested herein.

Dated:    New York, New York
          January 26, 2010


                    Respectfully submitted,

                    PREET BHARARA
                    UNITED STATES ATTORNEY

          By:  _____s/_____
                    Amie N. Ely /Howard S. Master
                    Assistant United States Attorneys
                    (212) 637-2214/2248

## <u>Certificate of Service</u>

The undersigned attorney, duly authorized to represent the United States before this Court, hereby certifies that on the below date, she served or caused to be served the following documents in the manner indicated:

Government's Motion for <u>In Limine</u> Rulings, Accompanying Affidavit, and Proposed Order

Service via Clerk's Notice of Electronic Filing upon the following attorneys, who are Filing Users in this case:

Barry Goldberg, Esq.

Stephen Goldenberg, Esq.

Dated:    New York, New York
          January 26, 2010

                              Respectfully submitted,

                              PREET BHARARA
                              UNITED STATES ATTORNEY

                   By:    _____s/_____
                          Amie N. Ely /Howard S. Master
                          Assistant United States Attorneys
                          (212) 637-2214/2248