UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

              - v. -              :    S1 09 Cr. 259 (DLC)

CARLOS MEJIA and                  :
JOEL RODRIGUEZ,
                                  :
              Defendants.
                                  :
- - - - - - - - - - - - - - - x


**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**


                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York,
                              Attorney for the United States
                                  of America


AMIE N. ELY
HOWARD S. MASTER
Assistant United States Attorneys
      - Of Counsel -

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

          - v. -              :      S1 09 Cr. 259 (DLC)

CARLOS MEJIA and              :
JOEL RODRIGUEZ,
                              :
          Defendants.
                              :
- - - - - - - - - - - - - - - x
```

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Carlos Mejia ("Mejia") and Joel Rodriguez ("Rodriguez") (collectively, the "defendants"), which is currently scheduled for Friday, June 11, 2009, at 11:00 a.m.

## BACKGROUND

### I.    Offense Conduct

On February 8, 2010, after a week-long trial, the defendants were convicted of conspiring to possess with the intent to distribute five kilograms and more of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A) and 846, and attempting to possess with the intent to distribute five kilograms and more of cocaine, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.  In particular, the defendants were part of a drug trafficking organization that transported multi-kilogram quantities of cocaine from Florida to the Bronx, New York.  The

cocaine would be hidden in cars or trucks, which Jonathan Mejia, Carlos Mejia's half brother ("Jonathan Mejia"), hired an unwitting car transporter (the "Car Transporter") to haul from Florida to the Bronx.  When the Car Transporter arrived in the Bronx, he would contact Mejia, and Mejia and Rodriguez would receive the vehicles.

The charges contained in the Superseding Indictment resulted from a "sting" operation that agents of the Drug Enforcement Administration ("DEA") set up after the Car Transporter discovered approximately twenty-eight kilograms of cocaine in one of the vehicles he'd been hired to transport using his truck (the "Truck").  Jonathan Mejia, who called himself "Moises," and a mysterious figured named "el Tiburon" brought a black convertible BMW 650i (the "Black BMW") to the Car Transporter in Miami, Florida.[1]  (Tr. 324).  In the days before he was scheduled to depart for the Bronx, the Car Transporter decided to drive the Black BMW, and, when he was driving around Miami with his seven-year old daughter, he tried to put down the

---

[1]     Jonathan Mejia rented the Black BMW from Pedro Ventura Cruz, who was married to Mejia's cousin.  (Tr. 181, 187, 190, 194).  Ventura Cruz was misidentified as "el Tiburon," and charged in the Superseding Indictment. After additional investigation revealed that he was not "el Tiburon," the charges against Ventura Cruz were dismissed.  During the trial, Ventura Cruz described a conversation with Jonathan Mejia in the Dominican Republic, after Mejia and Rodriguez had been arrested, in which Jonathan Mejia admitted he was "responsible for everything that happened with the car."  (Tr. 215).

convertible top.  (Tr. 326).  The top would not collapse into the
space designed for it.  (*Id.*).  The next day, the Car Transporter
drove the Black BMW again, this time with his friend, and again
tried to put the top down.  (Tr. 67-68; 327-28).  Again
unsuccessful, the Car Transporter and his friend inspected the
trunk and the well that was designed to contain the collapsed top
(the "Well").  (Tr. 69-70; 328-30).  In the Well, they found two
bags.  (Tr. 329-30).  And in those bags, they found what they
thought might be drugs.  (Tr. 105, 123; 330).  They left the bags
in the Well, and the Car Transporter drove the Black BMW and its
contents back to a lot where he parked his Truck; there, they
took the bags from the Well into another vehicle, and inspected
them more closely.  (Tr. 94; 332).  The two men concluded that
the powdery material contained in twenty-eight individually
wrapped packages was likely cocaine.  (Tr. 94; 330, 334-35).

        The Car Transporter reached out, through his lawyer, to
law enforcement officers a few days later.  (Tr. 144, 165; 338-
40).  At the request of DEA agents, the Car Transporter
transported the Black BMW, just as Jonathan Mejia and el Tiburon
directed, to the Bronx.  When the Car Transporter arrived in the
Bronx, just as expected, Mejia and Rodriguez showed up to pick up
the Black BMW.  Before they attempted to take the Black BMW, the
defendants engaged in what agents explained was counter-
surveillance: Rodriguez, in his gold Pontiac (the "Gold Pontiac")

-3-

drove around the block, again and again, trying to determine if law enforcement officers were present.  (Tr. 552).  After some time passed, Rodriguez returned with Mejia.  (Tr. 553).  Still later, after apparently concluding that the coast was clear, Mejia, who was then a passenger in a silver BMW (the "Silver BMW"), paid the Car Transporter and asked him to take the Black BMW off of his truck, and to take the Silver BMW back to Florida. (Tr. 342; 354; 556).  Mejia told the driver of the Silver BMW, a person who the Car Transporter did not recognize from prior pick-ups, (Tr. 353), to change the license plates from the Silver BMW to the Black BMW, so the Black BMW could be driven away.  (Tr. 494).  As Mejia's driver was changing the license plate, law enforcement officers arrested the driver, Rodriguez, and Mejia.[2]

## II.  The Defendants' Prior Narcotics Dealing

The defendants' arrest by DEA on January 22, 2009, was not the first day that they conspired to possess narcotics with the intent to sell them.  In addition to prior pick-ups of vehicles transported by the Car Transporter, the defendants were arrested on June 18, 2008 (the "June 2008 Arrest").  During the arrest, officers with the New York City Police Department ("NYPD") found a total of 62 bags of marijuana, one bag of

---

[2]     The passenger, Alphonso Sanchez, was charged in a complaint.  As Sanchez testified at the trial, the complaint was dismissed after he truthfully explained to the Government that Mejia had not explained the purpose of the trip in the Silver BMW.

cocaine, and $16,177 cash in a van owned by, and registered to, Rodriguez.  (Mejia PSR ¶¶ 52-53; Rodriguez PSR ¶¶ 55-56).

The June 2008 Arrest was set in motion when one young NYPD officer on routine patrol smelled marijuana emanating from a green van (the "Van"), and another noticed that Mejia appeared to be operating as a look-out for the Van.  (Tr. 664; 692). Rodriguez was in the Van's driver's seat, and the registration revealed that he was the Van's owner.  (Tr. 672).

As other NYPD officers watched Mejia, Rodriguez, and two other men who had been seated in the Van, another NYPD officer shined his flashlight into the Van's interior.  (Tr. 668).  The officer saw a hole that had been cut into the paneling of the Van; in that hole, he saw what appeared to be a stack of money.  (*Id.*).  After he pulled the money out, the officer saw many small baggies of marijuana, and a small bag of white powder. (*Id.*).  Mejia, Rodriguez, and the other two men were then arrested.  (*Id.*).  Charges of Criminal Possession of a Controlled Substance with Intent to Sell and Criminal Sale of Controlled Substance remain pending against Rodriguez, but were dismissed against Mejia.  (Mejia PSR ¶¶ 52-53; Rodriguez PSR ¶¶ 55-56).

## III. Rodriguez's Obstruction Of Justice

The Gold Pontiac Rodriguez drove to meet the Car Transporter on January 22, 2009, was registered in the name of Rafael Gonzales ("Gonzales").  (Tr. 628, 629).  As Gonzales

explained during the trial, Rodriguez purchased the Gold Pontiac "around the end of June of 2008"--not long after the NYPD seized the Van after the June 2008 Arrest.  (Tr. 628).  Rodriguez told Gonzales that he had certain issues with his license that prevented him from properly registering the Gold Pontiac in his name, and asked Gonzales to put the Gold Pontiac in his name. (Tr. 629).  Gonzales, a close family friend who thought of Rodriguez like a brother, (Tr. 645), agreed to let Rodriguez use his name on the registration.  (Tr. 630).

After Mejia and Rodriguez were arrested on January 22, 2009 and the DEA seized the Gold Pontiac, Rodriguez told Gonzales to petition for the return of the Gold Pontiac.  (Tr. 637). Rodriguez pressured Gonzales to falsely tell the DEA that the car belonged to Gonzales.  (Tr. 637).

Rodriguez's attempts to obstruct justice did not end when Gonzales refused to lie to regain custody of the Gold Pontiac.  Instead, after learning Gonzales had been subpoenaed to testify, Rodriguez again pressured Gonzales "say that the car was mine" when he testified.  (Tr. 640).  Rodriguez also told Gonzales to falsely testify that Rodriguez worked with him. (*Id.*).

In addition to Gonzales's testimony, other evidence at trial established that the Gold Pontiac clearly belonged to Rodriguez.  A copy of Rodriguez's résumé and various documents

associated with the June 2008 Arrest, including papers related to the seizure of the Van, were found in the Gold Pontiac.  (Tr. 576, 578).  Additionally, a document with information about Luxury Motor Enterprises, a business associated with Jonathan Mejia, was found in the Gold Pontiac.  (Tr. 575).  Agents also found three small bags of marijuana in "apple" branded bags, which matched the small bags containing marijuana that had been found in Rodriguez's Van during the June 2008 Arrest.  (Tr. 526-28, 674)

During the time that Rodriguez owned it, the Gold Pontiac was used to transport narcotics.  As Customs and Border Patrol Inspection Specialist Raymond Pardo testified, the Gold Pontiac was swabbed for narcotics residue.  (Tr. 708-09, 745).  The test results were clear: cocaine residue was spread throughout the Gold Pontiac.  (Tr. 709, 745).  Other narcotics contamination was also found in the car.  (Tr. 709, 745).

## IV.  Guidelines Calculations[3]

The defendants' Presentence Reports (the "PSRs") properly calculated the defendants' Offense Levels and Criminal History Categories under the United States Sentencing Guidelines

---

[3]     The Government emailed defense counsel on June 3, 2010, to inquire about whether either defendant would like to attempt to avail himself of "safety valve" relief under 18 U.S.C. § 3553(f) and U.S.S.G. §§ 2D1.1(b)(11) and 5C1.2.  As of the filing of this memorandum, we have not received a response.

("U.S.S.G." or the "Guidelines").  Rodriguez's PSR leaves to Your Honor the determination of whether Rodriguez has obstructed justice, since Your Honor "heard the testimony given at trial." (Rodriguez PSR ¶ 33).  For the reasons explained herein, the Government submits that Rodriguez's offense level should be increased by two levels under Section 3C1.1 of the U.S. Sentencing Guidelines.

### A.   Rodriguez's Advisory Guidelines Range Is 188-235 Months' Imprisonment

According to the PSR, Rodriguez has two prior convictions, both of which involved narcotics.  First, he was convicted of Attempted Criminal Sale of a Controlled Substance in the Third Degree in November 1995, and adjudicated a Youthful Offender for selling several glassines of heroin within 1,000 feet of a school.  (Rodriguez PSR ¶ 49).  For this crime, Rodriguez received a sentence of five years' probation. (Rodriguez PSR ¶ 49).  Rodriguez's second conviction--for unlawful possession of marijuana--was November 13, 2007, and he ordered to pay a $100 fine.  (Rodriguez PSR ¶ 52).  Pursuant to U.S.S.G. § 4A1.1(c), this conviction receives one criminal history point, which puts the defendant in Criminal History Category I.  (Rodriguez PSR ¶ 52).  Rodriguez also faces pending charges arising out of the June 2008 Arrest summarized in Section II.  (Rodriguez PSR ¶ 55).  According to the PSR, the next conference date in that case is scheduled for Monday, June 7,

2010.  If Rodriguez is convicted prior to his sentencing in the case before Your Honor, he could receive one or more additional criminal history points, pursuant to U.S.S.G. § 4A1.2(a)(4) and Applic. N.1.

Pursuant to U.S.S.G. § 2D1.1(a)(3) and (c)(3), Rodriguez's base offense level is 34, because he attempted and conspired to possess with the intent to distribute 28 kilograms of cocaine.  (Rodriguez PSR ¶ 37).  The Government submits that an additional two levels should be added to his offense level, pursuant to U.S.S.G. § 3C1.1, for obstruction of justice.  (Rodriguez PSR ¶ 33).  Accordingly, the Government's position is that Rodriguez's offense level is 36.  At an offense level of 36 and Criminal History Category I, the Guidelines range is 188 to 235 months' imprisonment ("Rodriguez's Government Guidelines Range").

The Guidelines range Probation applies does not include the two-level enhancement for obstruction of justice, and Probation makes no recommendation regarding the appropriateness of that enhancement.  (Rodriguez PSR ¶ 33).  Probation's Guidelines range is thus 151 to 188 months' imprisonment ("Rodriguez's Probation Guidelines Range"), and the officer recommends a sentence of 151 months' imprisonment; the mandatory five-year term of supervised release; and imposition of the mandatory $200 special assessment.

-9-

**B.   Mejia's Advisory Guidelines Range Is 151–188 Months' Imprisonment**

According to his PSR, Mejia was convicted in March 2002 of Appearance in Public Under the Influence of Narcotics or a Drug other than Alcohol after an NYPD officer encountered him in the early morning hours of January 31, 2002.  (Mejia PSR ¶¶ 49-50).  Mejia gave the police officer who stopped him a forged New York State insurance card which contained several inaccuracies, and was in possession of a gravity knife.  (Mejia PSR ¶ 50).  He was sentenced a one year conditional discharge and three days' community service, and receives no criminal history points for this conviction.  (PSR ¶ 49).

As noted above, Mejia was also arrested in the June 2008 Arrest; however, the charges against him have been dismissed.  (PSR ¶¶ 52-53).

Pursuant to  U.S.S.G. § 2D1.1(a)(3) and (c)(3), Mejia's base offense level is 34, because he attempted and conspired to possess with the intent to distribute 28 kilograms of cocaine. (Mejia PSR ¶ 37).  At an offense level of 34 and Criminal History Category I, Mejia's Guidelines range is 151 to 188 months' imprisonment ("Mejia's Guidelines Range").  Probation recommends a sentence of 151 months' imprisonment; the mandatory five-year term of supervised release; and imposition of the mandatory $200 special assessment.  (Mejia PSR at 17).  Probation notes that because Mejia is not a citizen of the United States, he will most

-10-

likely be deported upon the completion of any term of
imprisonment.  (Mejia PSR at 18).

## DISCUSSION

     For the reasons set forth below, sentences with the
defendants' respective advisory Guidelines ranges of 188-235
months' imprisonment for Rodriguez, and 151-188 months'
imprisonment for Mejia would be sufficient, but not greater than
necessary, to comply with the purposes set forth in Title 18,
United States Code, Section 3553(a)(2), following consideration
of all the factors set forth in Title 18, United States Code,
Section 3553(a).

## I.   Rodriguez Obstructed Justice By Tampering With A Witness

###      a.   Legal Standards[4]

     Before imposing the adjustment for obstruction of
justice under U.S.S.G. § 3C1.1, the district court must find that
the defendant "consciously act[ed] with the purpose of
obstructing justice."  *United States* v. *Case*, 180 F.3d 464, 467
(2d Cir. 1999) (internal quotation marks omitted); *see also*

---

[4]     At least as recently as April 2009, the Second Circuit
reiterated that the "preponderance-of-the-evidence
standard [remains] applicable to Guidelines
determinations."  *United States* v. *Hertular*, 562 F.3d
433, 447 (2d Cir. 2009) (citing *United States* v.
*Garcia*, 413 F.3d 201, 220 n. 15 (2d Cir.2005) (holding
that "[j]udicial authority to find facts relevant to
sentencing by a preponderance of the evidence survives
*Booker* [543 U.S. 220, 125 S.Ct. 738 (2005) ]")).

*United States* v. *Ayers*, 416 F.3d 131, 135 (2d Cir. 2005) ("The 'willfulness' required by § 3C1.1 pertains to obstruction of 'the administration of justice,' not a particular investigation."). For example, if the district court found that the defendant "clearly lied" in a statement made "under oath," the "court need do nothing more to satisfy *Dunnigan* than point to the obvious lie and find that the defendant knowingly made a false statement on a material matter." *United States* v. *Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000) (citing, *inter alia*, *United States* v. *Dunnigan*, 507 U.S. 87, 95 (1993)).

It is clear that a court need not actually rely upon false statements for an obstruction enhancement to apply: in *Lincecum*, for example, the defendant withdrew his affidavit before the suppression hearing, and the Government, in the end, did not use the defendant's post-arrest statements--which were the subject of the affidavit--at the defendant's trial. *Lincecum*, 220 F.3d at 80.  The Second Circuit held that "Given that Lincecum knowingly made false statements under oath expressly for the purpose of supporting a motion to suppress, and that those statements, if credited, would have led to the suppression of evidence, the district court's findings were adequate to support an offense-level adjustment for attempted obstruction of justice."  *Id.*

It is equally clear that a defendant who "unlawfully

-12-

influences" a co-defendant, or suborns perjury has obstructed justice under U.S.S.G. § 3C1.1.  U.S.S.G. § 3C1.1, Applic. N. 4(a), (b).[5]  For example, courts have held that directing another person to destroy evidence material to an official investigation supports application of § 3C1.1 enhancement.  *See, e.g.*, *United States* v. *Riley*, 452 F.3d 160, 165-67 (2d Cir. 2006); *accord United States* v. *Sarpong*, 309 Fed. Appx. 464, 465 (2d Cir. 2009) (applying obstruction enhancement where "a witness testified that Sarpong[, the defendant,] promised him that, in return for the witness's silence, Sarpong would help him and his wife obtain British visas").

### b.  Application

Rodriguez obstructed justice in several different ways: 1) by instructing Gonzales to attempt to obtain the Gold Pontiac from the DEA by falsely claiming that the Gold Pontiac belonged

---

[5]     The Application Notes to Section 3C1.1 provide a non-exhaustive list of examples of conduct meriting the two-point increase for obstruction:

4(a) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;

4(b) committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;

. . .

Gonzales; 2) by instructing Gonzales to lie during the trial before this Court by testifying that the Gold Pontiac belonged to Gonzales; and 3) by instructing Gonzales to lie during this trial by testifying that Rodriguez worked for him.  Each of these instances of witness tampering is alone sufficient to warrant the two-point enhancement for obstruction of justice; taken together, Rodriguez's ongoing course of witness tampering evinces a serious lack of regard for the system of justice.

Rodriguez first obstructed justice by instructing Gonzales to lie to the DEA about who actually owned the Gold Pontiac.  Based on Gonzales's testimony and on the documents that were found in the Gold Pontiac, is clear that Rodriguez, not Gonzales, owned the Gold Pontiac.  Given the overwhelmingly positive results of Inspector Pardo's tests for narcotics residue, even after the June 2008 Arrest, Rodriguez continued to use his vehicle in his narcotics business.  This evidence supports the conclusion that Gonzales's name was on the registration merely because Rodriguez learned from the June 2008 Arrest that law enforcement would seize vehicles that were used in the narcotics trade.  Upon realizing that the DEA was likely to seize the Gold Pontiac, Rodriguez told Gonzales to lie to try to get the car back.  Under  Application Note 4(b) to Section 3C1.1, the enhancement applies if a defendant suborns or attempts "to suborn perjury, including during the course of a civil

-14-

proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction."  Given the use of the Gold Pontiac in the narcotics conspiracy, the enhancement would apply to Rodriguez's attempt to cause Gonzales to lie to the DEA to obtain the Gold Pontiac.

Rodriguez's attempt to suborn perjury during the trial provides even stronger support for the enhancement.  First, Rodriguez again instructed Gonzales to lie, under oath, about the ownership of the Gold Pontiac.  The presence of both narcotics residue and documents linking Rodriguez to co-defendant Jonathan Mejia provide ample motive for Rodriguez to ask his friend to lie about owning the Gold Pontiac.  *See Sarpong*, 309 Fed. Appx. at 465 (obstruction enhancement where defendant attempted to procure witness's silence).  Rodriguez's request that Gonzales lie about whether Gonzales employed him--lies that would have helped explain Rodriguez's unexplained, if modest, wealth--also warrants the obstruction enhancement.

During his closing argument, defense counsel essentially conceded that Rodriguez had tampered with Gonzales. Namely, Richard Wojswilo, Esq., acknowledged that "the real reason" Rodriguez put the Gold Pontiac in Gonzales's name was "that he was trying to protect against the eventuality or the possibility that the car might be seized, taken [a]way from him the way the van was seized and taken away from him by the New

-15-

York City Police Department."  (Tr. 928).  Defense counsel added
that Rodriguez should not have "force[d]" Gonzales "to do
anything deceitful like that, just like you shouldn't ask him to
say he works for you or I work for him."  (*Id.*).

Despite the pressure that Rodriguez applied, and the
loyalty that he felt to Rodriguez and his family, Gonzales
refused to lie.  As a result, the jury learned that Rodriguez had
no legitimate source of income yet managed to purchase the Gold
Pontiac, which he used in his narcotics business, and to support
himself.  Rodriguez's attempts to suborn perjury to prevent the
jury from learning these facts, and to cause the DEA to return
the Gold Pontiac, support the two-level enhancement for
obstruction of justice.

**II.  Sentences Within Rodriguez's Government Guidelines Range and
Mejia's Guidelines Range Would Be Both Reasonable And
Sufficient, But No More Than Necessary, To Achieve The
Legitimate Purposes Of Sentencing**

The United States Sentencing Guidelines (the
"Guidelines") still provide strong guidance to the Court in light
of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States*
v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that
the Guidelines are no longer mandatory, it held also that the
Guidelines remain in place and that district courts must
"consult" the Guidelines and "take them into account" when
sentencing. 543 U.S. at 264. As the Supreme Court recently

-16-

stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1)); the four legitimate purposes of sentencing (§ 3553(a)(2)); "the kinds of sentences available" (§ 3553(a)(3)); the Guidelines range itself (§ 3553(a)(4)); any relevant policy statement by the Sentencing Commission (§ 3553(a)(5)); "the need to avoid unwarranted sentence disparities among defendants" (§ 3553(a)(6)); and "the need to provide restitution to any victims" (§ 3553(a)(7)). *Gall* v. *United States*, 128 S. Ct. at 596 n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)  to afford adequate deterrence to criminal conduct;

      (C)    to protect the public from further crimes of the
             defendant; and

      (D)    to provide the defendant with needed educational or
             vocational training, medical care, or other
             correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 128 S. Ct. at 596 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 128 S. Ct. at 594; *see also Rita* v. *United States*, 127 S. Ct. at 2464. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 127 S. Ct. at 597.

Here, the defendants' criminal actions demonstrate a need for a significant period of incarceration.  First, sentences within their respective Guidelines ranges are necessary to afford adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a)(2)(B).  While neither of them have substantial criminal histories, both have previous interactions with the criminal justice system; Rodriguez, in particular, has a prior conviction associated with selling heroin near a school.  Perhaps more importantly, they were undeterred by the June 2008 Arrest--an arrest for conduct similar to the instant charges, where they exploited a makeshift "trap" in a vehicle to transport narcotics and narcotics proceeds.  Indeed, if anything, the June 2008 Arrest appeared to embolden these two defendants, who appear to have increased the scale of their operation.  Moreover, as Your Honor learned during the trial, after he was bailed on the instant charges in February 2009, Mejia bragged to a friend using the private messaging system provided by "MySpace" that he "control[led] the area of the south," and that he "traffick[ed in] kilos."  (Tr. 862).  These are not the words of a contrite man--they are the boasts of a drug dealer who believed that he would be able to again evade a conviction.[6]

---

[6]     Mejia also had to be admonished during the trial for "reacting . . . by vigorously shaking his head in agreement or disagreement."  (Tr. 381).  Your Honor noted that Mejia "shook his head dramatically to indicate disagreement" during the Government's opening

Sentences within their respective Guidelines ranges would to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.  18 U.S.C. § 3553(a)(2)(A).  Evidence at trial suggested that this was not the defendant's first time dealing in narcotics.  In addition to the June 2008 Arrest, the Car Transporter explained that he had brought several other vehicles to Mejia and Rodriguez, and returned to Florida with other vehicles in the months preceding the sting operation.  This evidence suggests that these defendants were engaging in an ongoing, and profitable, transhipment of narcotics and narcotics proceeds.  Rodriguez's obstruction of justice is a serious aggravating fact that warrants a substantial sentence, given the system's dependence of the truthful testimony of witnesses.  While Rafael Gonzales managed to withstand the entreaties of the man he felt to be like a brother, Rodriguez's willingness to exploit this friendship to try to regain custody of his Gold Pontiac and to increase his chances of acquittal warrants additional punishment.

In light of all the factors set forth in Title 18, United States Code, Section 3553(a), the policies set forth in the advisory Sentencing Guidelines, the facts set forth in the PSRs, and the arguments above, sentences between 188 and 235

---

statement, (Tr. 73), and, even after he had been warned about that reaction, continued similar behavior during the Car Transporter's testimony.  (Tr. 381).

months' imprisonment for Rodriguez, and between 151 and 188 months' imprisonment for Mejia would be sufficient but not greater than necessary to comply with the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a)(2).

## CONCLUSION

For the reasons stated herein, the Court should sentence Rodriguez to a term of imprisonment between 188 and 235 months, and sentence Mejia to a term of imprisonment between 151 and 188 months.

Dated:    New York, New York
          June 4, 2010

                        Respectfully submitted,

                        PREET BHARARA
                        United States Attorney for the
                        Southern District of New York
                        Attorney for the United States
                             of America

                        By: ___/s_____
                            AMIE N. ELY
                            Assistant United States Attorney
                            (212) 637-2214

-21-

AFFIRMATION OF SERVICE

AMIE N. ELY, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.

That on June 4, 2010, I caused one copy of the within Memorandum of Law to be served by e-mail on:

Barry R. Goldberg, Esq. at cgbgplus3@aol.com

Stephen Mark Goldenberg, Esq. at smgoldesq@aol.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   New York, New York
         June 4, 2010

___/s_____
AMIE N. ELY